Order, Supreme Court, Bronx County (Norma Ruiz, J.), entered October 15, 2012, which granted defendant’s motion for summary judgment dismissing the complaint, unanimously affirmed, without costs.
The complaint describes plaintiff’s decedent as a then 60-year-old man with an extensive medical history that included diabetes and peripheral vascular disease, which caused him to develop ulcerations on his lower extremities. It is alleged that he suffered an injury on August 22, 2006 when, while being transferred into a wheelchair, his left ankle struck the footrest, opening an old ulcer that was scabbed over. The wound expanded and worsened over the following weeks and eventually became gangrenous, necessitating a below-the-knee amputation six months later.
The record reflects that as a result of an injury to the left pretibial area (shin) sustained in October 2005, decedent was treated at the Wellington Regional Medical Center (WRMC) in Florida. A diagnosis of “necrotic eschar with ulceration down to the tibial bone” was made and “the possibility of limb loss given the extent of disease” was discussed. Decedent returned to WRMC in July 2006 “for non healing ulcer in the left proximal leg and knee region.” A diagnosis of “[l]eft proximal tibial osteomyelitis with significant soft tissue compromise in a patient with multiple comorbidities” was rendered and decedent advised to undergo an above-the-knee amputation. The prognosis for salvaging the leg was deemed to be unfavorable due to *406 poor circulation and significant soft tissue compromise and because comorbidities including diabetes and peripheral vascular disease made healing “very difficult.”
Decedent was discharged from WRMC in August 2006 against medical advice and began treatment at New York Hospital Medical Center of Queens (NYHQ), where the ulcer was noted as not healing. Decedent was then discharged directly to defendant nursing facility on August 18, 2006. Upon admission, he was observed to have two stage IV ulcers on the left leg, meaning the loss of skin and subcutaneous tissue, exposing muscle and bone. On readmission to NYHQ subsequent to the alleged incident for treatment of pneumonia in October of that year, an MRI was inconclusive as to whether osteomyelitis was still present. Below-the-knee amputation of the left leg was ultimately performed at Montefiore Medical Center in February 2007, allegedly as a result of the injury suffered on August 22, 2006.
In support of the motion, defendant argued that statements made by its staff members during the course of an investigation indicate that decedent gave conflicting accounts of when the injury to his ankle occurred—upon transfer to the wheelchair following a physical therapy session or earlier in his room. In any event, the affidavit of defendant’s expert witness states that amputation “was inevitable long before Mr. Iciano was admitted to Franklin.” It opines that defendant had promptly noted that the ulceration had opened and had responded with medically appropriate treatment, including cleaning and dressing the wound and administering a course of antibiotics. It should further be noted that amputation had been recommended seven months earlier by a surgeon in Florida and that the tissue damage resulting from peripheral vascular disease commonly causes ulcers with “a continuous cycle of healing and breakdown and recurrence.”
In response, plaintiff’s expert attributed amputation to the injury complained of. However, he did not specify the basis for his conclusion, noting only that “no other extremity required amputation” and that other, larger ulcerations had healed.
The complaint was properly dismissed. The amputation of decedent’s leg was “the unavoidable result of . . . preexisting, chronic conditions, as well as other risk factors” (Negron v St. Barnabas Nursing Home, 105 AD3d 501, 501 [1st Dept 2013]). The observation by plaintiffs medical expert that an above-the-knee amputation had been avoided does not axiomatically warrant the conclusion that a below-the-knee amputation should likewise have been avoidable. As remarked by defendant’s medical expert, a May 2006 report from WRMC noted that while *407 decedent’s left popliteal artery pulse (taken behind the knee) was weak, the dorsal pedis and posterior tibial pulses (at the ankle) were completely absent. Thus, plaintiff failed to overcome defendant’s prima facie showing that it did not depart from accepted medical practice because amputation was required prior to decedent’s admission to defendant’s nursing facility (see Alvarez v Prospect Hosp., 68 NY2d 320, 325 [1986]).
Concur— Tom, J.E, Friedman, Acosta, Andrias and Richter, JJ.